**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PROGENICS PHARMACEUTICALS, INC., and EXINI DIAGNOSTICS AB, <br><br> Plaintiffs, <br><br> v. <br><br> MIM SOFTWARE INC., <br><br> Defendant. | Civil Action No. 1:24-cv-10437-PBS <br><br> Leave to file excess pages granted on March 5, 2025[1] |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

---

[1] In its Scheduling Order, the Court permitted each side 40 pages for claim construction briefing. Dkt. 85 at 2.

## <u>TABLE OF CONTENTS</u>

**Page**

I.    TECHNOLOGY OVERVIEW AND THE ASSERTED PATENTS................................ 1

    A.    '428 Patent ................................................................................................ 2

    B.    '486 Patent ................................................................................................ 4

II.    LEGAL STANDARDS ........................................................................................ 5

III.    DISPUTED TERMS ............................................................................................ 6

    A.    "fit[ting] … a multi-component mixture model to a distribution of
        intensities of voxels within the reference volume"................................. 6

    B.    "a major mode of the multi-component mixture model"........................ 8

    C.    "one or more uptake metrics indicative of radiopharmaceutical uptake
        therein"................................................................................................... 12

    D.    "first module" and "second module" .................................................... 15

    E.    "a dilated bladder volume" ................................................................... 19

    F.    "correct[ing] for cross-talk from the bladder" .................................... 21

IV.    CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Abiomed, Inc. v. Maquet Cardiovascular LLC*,
   329 F. Supp. 3d 1 (D. Mass. 2018) ....................................................................15

*Allergan Sales, LLC v. Sandoz, Inc.*,
   935 F.3d 1370 (Fed. Cir. 2019)..........................................................................5

*In re Body Sci. LLC Patent Litig.*,
   2014 U.S. Dist. LEXIS 148160 (D. Mass. Oct. 17, 2014)..........................11, 12, 21

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*,
   246 F.3d 1368 (Fed. Cir. 2001)..........................................................................13

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)..................................................................12, 13, 14

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) .........................................................15, 16, 17, 18

*K&K Jump Start/Chargers v. Schumacher Elec. Corp.*,
   52 F. App'x. 135 (Fed. Cir. 2002) .....................................................................15

*Liquid Dynamics Corp. v. Vaughan Co.*,
   355 F.3d 1361 (Fed. Cir. 2004)..........................................................................8

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)...........................................................................................5

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)................................5

*Milliman, Inc. v. Gradient A.I. Corp.*,
   651 F. Supp. 3d 424 (D. Mass. 2023) ...............................................................11

*Nellcor Puritan Bennett, Inc. v. Masimo Corp.*,
   402 F.3d 1364 (Fed. Cir. 2005)......................................................................7, 20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...............................................................5, 11, 22

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
   989 F.3d 1002 (Fed. Cir. 2021)....................................................................18, 19

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
   130 F.4th 1372 (Fed. Cir. 2025) .......................................................................22

*Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*,
  887 F.3d 1153 (Fed. Cir. 2018)...................................................................5, 6, 9, 20

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002)...........................................................................5, 7

*Thorner v. Sony Comput. Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)...............................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996).................................................................................5

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015).........................................................................18, 19

*Zeroclick, LLC v. Apple Inc.*,
  891 F.3d 1003 (Fed. Cir. 2018).........................................................................18, 19

**Statutes**

35 U.S.C. § 112(f)...................................................................................................15

**Other Authorities**

*Module*, Cambridge Bus. English Dictionary ..........................................................17

*Module*, Oxford English Dictionary .......................................................................17

Presently at issue are seven disputed claim terms arising from two of Plaintiffs' patents—U.S. Patent Nos. 11,721,428 ("the '428 Patent") and 10,973,486 ("the '486 Patent").[2] The two patents describe and claim innovative techniques for enhancing the accuracy and reliability of 3D medical image analysis. The asserted claims of both patents are written in clear language grounded in the field of AI-assisted medical imaging. Plaintiffs did not propose that any terms in the two patents require judicial construction, because the claims are readily understandable by a person of ordinary skill in the art (POSA) and thus require no departure from the plain and ordinary meaning. Defendant, by contrast, proposes constructions for seven terms across the two patents. Defendant's proposed constructions are legally flawed, internally inconsistent, and untethered from the intrinsic record. Through the guise of claim construction, Defendant seeks to artificially narrow the scope of the patents, manufacture ambiguity where none exists, and generate self-serving non-infringement positions.

The Court should reject Defendant's constructions and adopt either (a) the plain and ordinary meaning for each disputed term or (b) Plaintiffs' alternative construction that closely tracks the plain and ordinary meaning.

## I.    TECHNOLOGY OVERVIEW AND THE ASSERTED PATENTS

The '428 and '486 Patents disclose innovative systems and methods that help physicians more consistently and accurately use nuclear medicine images produced by medical scanners (e.g., PET/SPECT scanners) to predict where a cancerous tumor is within a patient's body. The patents teach that, before a patient undergoes scanning, he is administered a radiopharmaceutical, which is a radioactive tracer designed to bind to a disease cite (e.g., cancer lesions). *See, e.g.*, Ex. A[3] ('428 Patent) at 1:25-41. The radioactive tracer emits radiation. A scanner detects the radiation

---

[2] The Court stayed proceeding (pending IPR institution decisions) for four of the six asserted patents in this case.

[3] All exhibits referenced herein are attached to the accompanying Declaration of Michael H. Bunis, Esq.

and translates it into a 3D functional image showing how much radiopharmaceutical accumulated in different parts of the image. *See, e.g.*, *id.* at 1:42-47. "[N]uclear medicine imaging is a valuable technique for providing physicians with information that can be used to determine the presence and the extent of disease in a patient," which a "physician can use . . . to provide a recommended course of treatment to the patient and to track the progression of disease." *Id.* at 1:66-2:4.

The 3D images described in the patents consist of "voxels," which are the 3D-equivalent of pixels in a 2D image. Each voxel represents a small 3D cube of the 3D image. *See id.* at 4:23-37. A voxel's standardized uptake value ("SUV") reports how much radiopharmaceutical it accumulated, normalized for patient variability (e.g., weight). *See id.* The amount of accumulated radiopharmaceutical is called the "radiopharmaceutical uptake." *See id.* Measuring radiopharmaceutical uptake helps identify tumors in the 3D images because regions with high uptake may reflect the presence of a tumor.

Against this backdrop, the '428 and '486 Patents claim solutions that improve the ability to pinpoint (with greater accuracy) the location and shape of a particular tumor inside the body.

### A.    '428 Patent

The '428 Patent teaches systems and methods that improve a physician's ability to track changes in a patient's tumor over time. While radiopharmaceutical uptake is a generally reliable measure of a tumor's size and severity, tracking changes over time is challenging because uptake can vary based on a patient's changing weight, radiopharmaceutical dosage, imaging conditions, etc. For example, as a cancer patient's weight and medications change over the court of cancer treatment, that patient's radiopharmaceutical uptake may vary from scan to scan. Therefore, comparing one image to another image taken at a different time can be misleading. To address this, the patent teaches using the amount of radiopharmaceutical uptake in the voxels of a healthy reference organ, like a liver or aorta, as a baseline against which to compare uptake in other regions

of the image (including suspected tumor tissue). *Id.* at 3:10-23.[4] If a portion of the image shows much higher radiopharmaceutical uptake than the patient's baseline, the differential suggests a tumor may be present. *Id.*

But this reference organ approach presents a key risk. Healthy reference organs can become diseased themselves, for example, by developing a tumor. When that happens, the voxels representing the reference organ may accumulate abnormal amounts of radiopharmaceutical and will thus misrepresent the patient's reference organ baseline.

To address this risk, the '428 Patent teaches methods and systems for identifying healthy tissue in the reference organ (and excluding any diseased tissue). Specifically, the patent teaches using a multi-component mixture model to differentiate the various components of the reference organ (e.g., healthy tissue, tumor tissue, cyst tissue) based on the comparatively different radiopharmaceutical uptake in each tissue type. *Id.* at 29:60-30:13. The model characterizes each component in terms of its mean SUV (the average amount of radiopharmaceutical uptake in the voxels representing that component), variance of SUV (how much radiopharmaceutical uptake of those voxels varies), and overall weight (how many voxels in the image represent that component). *Id.* at 30:14-39. The model thus distinguishes clusters of voxels that exhibit similar uptake behavior—each cluster corresponding to a component representing a particular type of tissue—and estimates how much of the image each component represents.

---

[4] *See also* Ex. A at 29:27-31 ("Use of such reference values in computing lesion index values is described in further detail, for example, in PCT/EP2020/050132, filed Jan. 6, 2020, the contents of which is hereby incorporated by reference in its entirety."); Ex. C (PCT/EP2020/050132) at [0015] ("the ability to accurately and rapidly perform full body segmentation via the approaches described herein is leveraged to provide a useful and uniform scale on which to evaluate and/or measure radiopharmaceutical uptake levels in physical lesions corresponding to detected hotspots . . . . These reference VOIs are also mapped to the PET image, to identify corresponding reference volumes therein. Measures of intensity, such as a mean, peak, maximum, etc., within these reference volumes are then computed and used as reference points against which to evaluate intensities of individual detected hotspots[.]").

The patent then teaches identifying a "major mode" of the multi-component model, which is the component that represents the most prevalent tissue type in the image. *Id*. The "major mode" component is typically the normal healthy tissue. *Id*. at 29:60-30:13. Identifying the major mode is important to the patented method because it establishes the baseline for "normal" radiopharmaceutical uptake in the patient's reference organ, against which uptake in other regions can be compared.

### B.    '486 Patent

The '486 Patent, on the other hand, provides a solution to the challenge of accurately identifying and quantifying prostate-specific radiopharmaceutical uptake in 3D functional images. High uptake in organs neighboring the prostate—particularly the bladder—can distort measurement of prostate uptake due to a phenomenon known as "cross-talk," which is when radiopharmaceutical signals from nearby organs spill over into the prostate region of the image. Ex. B ('486 Patent) at 9:32-48. The patent describes a solution that automatically processes paired anatomical and functional images, localizes the relevant tissue structures, segments the prostate, and calculates uptake metrics. *Id*. at claims 1, 7. To do this, the invention uses a modular image-processing system and method that is executed by a computer processor. *Id*. Once the prostate is segmented (i.e., once the boundaries of the different tissue types in the prostate are automatically delineated), the invention measures uptake within the prostate volume. *Id*.; *see also*, *e.g.*, *id*. at 4:14-24; 4:45-56. To enhance accuracy, the invention includes a process for correcting for 'cross-talk' between the bladder and the prostate. The cross-talk correction involves identifying voxels in the image corresponding to the bladder and adjusting some of their intensities, which enables more accurate and reproducible measurement of true prostate uptake, in turn improving the clinical utility of the 3D imaging analysis. *Id*.; *see also id*. at 5:20-30.

## II.    LEGAL STANDARDS

Claim construction is an issue of law for the court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996). Courts begin claim construction by "look[ing] first to the language of the claims." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1374 (Fed. Cir. 2019). "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The plain and ordinary meaning "controls unless 'a patentee sets out a definition and acts as his own lexicographer, or . . . the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*, 887 F.3d 1153, 1157 (Fed. Cir. 2018) ("*Sumitomo*").

"Claims must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The specification "is the single best guide to the meaning of a disputed term" and "[u]sually, it is dispositive." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Nonetheless, courts should be careful not to limit the claims to the specific embodiments in the specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). "[I]mport[ing] limitations from the written description into the claims" is a "'cardinal sin' of claim construction." *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

## III.    DISPUTED TERMS

### A.    "fit[ting] … a multi-component mixture model to a distribution of intensities of voxels within the reference volume"

| Defendant's Construction | Plaintiffs' Construction |
|---|---|
| **determining a plurality of curves that together approximately fit a plot of** a distribution of intensities of voxels within the reference volume | Plain and ordinary meaning<br><br>Alternatively, "**fit[ting] a model that represents an overall distribution as composed of two or more components to** the observed distribution of intensities of voxels within the reference volume" |

Claims 1 and 13 of the '428 Patent refer to "fit[ting] . . . a multi-component mixture model to a distribution of intensities within the reference volume." The parties agree that the second half of the term, "a distribution of intensities of voxels within the reference volume," does not require construction. Both parties simply adopted the language, as it appears in the claim, into the construction. The dispute, therefore, is what it means to "**fit . . . a multi-component mixture model to**" that distribution. The term should be given its plain and ordinary meaning (or Plaintiffs' alternative construction that closely captures that meaning). Defendant's proposal is wrong because it changes the grammatical structure of the disputed term and imports limitations involving "curves" and "plots" found nowhere in the claims.

Because Plaintiff neither clearly defined nor disavowed the full scope of the claim term in the specification or prosecution, the plain and ordinary meaning applies. *See Sumitomo*, 887 F.3d at 1157. In light of the claims and specification, a POSA would understand that "**fit[ting] . . . a multi-component mixture model to**" a distribution is simply fitting a model that represents an overall distribution as composed of two or more components (i.e., a **multi-component** model) to the distribution.

This common-sense interpretation comports with the intrinsic record. As discussed above, the specification explains that fitting a multi-component mixture model is a mathematical

calculation. *See* Ex. A ('428 Patent) at 10:50-52. It involves calculating the statistical parameters of (i.e., fitting) a model that treats a distribution of voxel intensities as originating from two or more components (i.e., different tissue types, like healthy tissue and tumor tissue) within a given reference organ (like a liver). *See id.* at 10:50-59; *id.* at 29:60-31:7. Therefore, the term "fit[ting] . . . a multi-component mixture model to a distribution of intensities within the reference volume" should receive its plain and ordinary meaning, or an alternative that explains what that plain and ordinary meaning is: "fit[ting] . . . a model that represents an overall distribution as composed of two or more components to the observed distribution of intensities of voxels within the reference volume." *See* Dkt. 111-1 at 1.

Defendant's proposed construction ("determining a plurality of curves that together approximately fit a plot of a distribution of intensities of voxels within the reference volume") is wrong for two reasons. First, Defendant introduces complexity by changing the grammatical structure of the disputed term. The disputed term describes "fitting an [X] to a [Y]." *See* Ex. A, claims 1, 13. Regardless of what X and Y are construed to mean, Plaintiffs' construction matches the claim's grammatical structure. Defendant, on the other hand, complicates the structure by changing it to, "determining an [X] that approximately fits a plot of a [Y]." By adding the unclaimed "determining" language to the construction, Defendant imports an additional unclaimed step. *See Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1371 (Fed. Cir. 2005) ("*Nellcor*") ("[W]e cannot construe the claim to add a limitation not present in the claim itself.") (citation omitted).

Defendant's construction is wrong for the further reason that it commits "the cardinal sin" of importing limitations from an example in the specification. *See Teleflex, Inc.*, 299 F.3d at 1324. As discussed above, fitting a multi-component model is a mathematical calculation, not a graphical

one. Curves representing the different components *can* be displayed on a histogram for purposes of graphical illustration (as in FIG. 2A of the patent), but such an illustration is not required by the claims. Ex. A at 30:35-39 ("FIG. 2A ***illustrates*** an example liver reference computation, ***showing*** a histogram of liver SUV values with Gaussian mixture components shown in red and the separation threshold marked in green.") (emphasis added). The claims do not use the terms "curve" or "plot." Defendant's construction improperly adds limitations to the algorithmic process of multi-component modeling by: (a) requiring a graphical exercise of drawing curves on a histogram or some other "plot," and thus (b) importing limitations from FIG. 2A, like "curves" and "plot," that do not appear in the claim language or specification. *See Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1369 (Fed. Cir. 2004) (overruling district court's claim construction where "the district court relied on" two figures of the patent "to import the limitation [from those figures]"). Where "[t]here is no language in the claim requiring" that specification examples be included as claim limitations, the Federal Circuit has "consistently warned against this approach to claim construction." *See id.*

The Court should thus apply the plain and ordinary meaning, or Plaintiffs' proposed alternative that captures the plain and ordinary meaning.

B. **"a major mode of the multi-component mixture model"**

| Defendant's Construction | Plaintiffs' Construction |
|---|---|
| the curve of the plurality of curves that has the higher intensity value peak | Plain and ordinary meaning<br><br>Alternatively, "a component of the multi-component mixture model that represents the most prevalent sub-population in the voxel-intensity distribution" |

This term appears in the next step of the same claims described above, claims 1 and 13 of the '428 Patent, and builds on the method and system claimed therein. Step (c) involves "fitting . . . a multi-component mixture model to a distribution of intensities of voxels within the reference

volume." Then, step (d) involves "identifying, by the processor, **a major mode of the multi-component model**." The parties disagree about the meaning of a "major mode" of the multi-component model. Plaintiffs propose that the plain and ordinary meaning should apply (or else Plaintiffs' alternative construction that closely captures that meaning). Defendant once again tries to import a graphical curve-drawing limitation that does not appear in the claim language.

As the patentee neither defined nor disavowed the full scope of the claim term in the specification or prosecution, the plain and ordinary meaning applies. *See Sumitomo*, 887 F.3d at 1157. In light of the claims and specification, the plain and ordinary meaning of "a major mode of the multi-component mixture model" is simply the most prevalent component (or sub-population) in the image, i.e., the tissue type that accounts for the largest proportion of the image. Ex. A at 10:24-67.

The specification explains that each component of the multi-component model corresponds to a different component (e.g., tissue type, for example, healthy or tumor tissue), which the model tries to differentiate based on the amount of radiopharmaceutical uptake in that component. *Id*. at 30:46-31:8. The major mode is thus the component that is most prevalent in the image; in other words, it is the tissue type that makes up the largest share of the image. To illustrate this, the specification provides an optional example (FIG. 2A) of how one can visualize the major and minor modes by representing the model's mathematical analysis on a histogram. Ex. A at 30:14-39 (describes FIG. 2A as "a histogram of liver SUV values overlaid with a two-component Gaussian mixture model," i.e., an exemplary illustration of a multi-component model):



FIG. 2A

The specification explains that Figure 2A "illustrates an example liver reference computation, showing a histogram of liver SUV values with Gaussian mixture components shown in red." Ex. A at 30:35-39. The X-axis shows the SUV, i.e., the degree of radiopharmaceutical uptake. *Id.* The Y-axis shows the number of voxels. Thus, the histogram shows how many voxels (Y-axis) accumulated different degrees of radiopharmaceutical (X-axis). *Id.*

The red curves overlaid on the histogram serve as an optional graphical demonstration of the multi-component model's calculations. *Id.* The model aims to differentiate the components (tissue types) based on the tendency for voxels of each component to exhibit similar (although not identical) radiopharmaceutical uptake. *Id.* In this example (FIG. 2A), the two red curves are an optional graphical illustration of the model's estimate that this example contains two components (e.g., healthy tissue and tumor tissue). Each of the two red curves represents a different component. The voxels (i.e., the blue parts of the histogram) beneath each curve are the voxels that the model predicts are part of each respective component (i.e., tissue type). Thus, in this optional illustration, the "major mode" is the component represented by the red curve with the higher peak because that curve covers more blue voxel data on the histogram (i.e., more area under the curve), meaning that it is the more prevalent component in the image.

The plain and ordinary meaning should thus apply. Alternatively, if the term requires construction, the most suitable construction that embraces the plain and ordinary meaning is: "a component of the multi-component mixture model that represents the most prevalent sub-population in the voxel-intensity distribution." Such a construction explains the meaning of "major mode."

Defendant's proposed construction ("the curve of the plurality of curves that has the higher intensity peak") is much too narrow compared to the actual claim language, for two reasons. First, as explained above, it seeks to impose on the "multi-component mixture model" part of the term limitations that the claims do not require. *See supra* at 9-10. The graphical illustration in Figure 2A is an *optional* visualization of the model's calculations. *See, e.g.*, Ex. A ('428 Patent) at 30:35-36 ("FIG. 2A illustrates an example liver reference computation"); 22:10-12 (referring to Figure 2A as a visual demonstration of "an illustrative embodiment"). The terms "peak" and "curves" do not appear in the claim language. Defendant's construction would improperly require histogram-use (like exemplary Figure 2A) and would also require drawing curves on the histogram. The claims do not require a visual approach to measurement.

Second, Defendant's construction ("the curve of the plurality of curves that has the **higher** intensity value peak") not only imports an example from the specification, but also wrongly injects ambiguity into the claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *In re Body Sci. LLC Patent Litig.*, 2014 U.S. Dist. LEXIS 148160, at *29 (D. Mass. Oct. 17, 2014) (adopting plain and ordinary meaning of term where "Defendants' proposed construction would only render the claim redundant, and more likely create confusion than clarity"); *Milliman, Inc. v. Gradient A.I. Corp.*, 651 F. Supp. 3d 424, 430 (D. Mass. 2023) (adopting ordinary meaning of term where "Plaintiffs' proposed construction would more likely confuse, than help, the jury")

(citation omitted). The patent does not limit the multi-component model to only identifying two components. The specification expressly refers to an embodiment involving "identifying one **or more** minor peaks," which means the invention includes models reporting three or more components (and thus at least two minor modes and one major mode). Ex. A at 7:35-36, 16:16-17. If an image has three or more components, then Defendant's "high**er** peak" construction would fail to clearly identify which component is the "major" mode—is it the second-highest peak that is higher than the lowest peak, or is it the highest peak that is higher than the second-highest peak? *See id.*; *In re Body Sci. LLC Patent Litig.*, 2014 U.S. Dist. LEXIS 148160, at *29; *Milliman, Inc.*, 651 F. Supp. 3d at 430 . In contrast, a component's prevalence, as used in Plaintiff's construction, is unambiguous. The most prevalent component would be the "major mode" regardless of how many components exist.

The Court should thus assign the disputed term its plain and ordinary meaning, or at least apply Plaintiffs' proposed alternative construction that closely matches the plain and ordinary meaning.

> **C.    "one or more uptake metrics indicative of radiopharmaceutical uptake therein"**

| Defendant's Construction | Plaintiffs' Construction |
|---|---|
| one or more metrics indicative of the quantity of a radiopharmaceutical absorbed by the prostate volume of the subject | The quoted term comes from the preambles of claims 1, 39-42, and 48-50. Those preambles are not limiting, and thus no construction is required. |

The preambles of claims 1, 39-42, and 48-50 of the '486 Patent include the phrase "one or more uptake metrics indicative of radiopharmaceutical uptake therein." The Court need not construe this term because the preambles are not limiting.

A preamble only "limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l v.*

*Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). The preamble is not limiting, however, "where a patentee **defines a structurally complete invention in the claim body** and uses the preamble **only to state a purpose or intended use** for the invention." *Id.* at 808 (emphasis added); *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 246 F.3d 1368, 1373 (Fed. Cir. 2001) (same).

Here, the preambles are not limiting for two reasons. First, they only state a purpose or intended use for the invention. *See Catalina Mktg. Int'l*, 289 F.3d at 808. The remainder of the claims (the lettered limitations) describe the essential steps. Said differently, a structurally complete invention exists within the claim body. *Id.* The preamble to representative claim 1, for example, recites "[a] method for automatically processing 3D images to identify 3D volumes within the 3D images that correspond to a prostate of a subject and determining **one or more uptake metrics indicative of radiopharmaceutical uptake therein**." (emphasis added). The remainder of the claim sets out how the uptake metrics work. The preamble thus conveys the purpose and intended use, which includes "determining . . . metrics indicative of radiopharmaceutical uptake." Ex. B at 74:4-5 (claim 1), 78:37-38 (claim 39), 79:15-16 (claim 40), 79:56-57 (claim 41), 80:35-36 (claim 42), 84:24-25 (claim 48), 85:1-2 (claim 49), 85:50-51 (claim 50).

Second, the body of each claim recites complete, independent processing steps to achieve the claims' intended use of "determining one or more uptake metrics," including "receiving [an] image," "determining [a] volume of interest," "identifying [a] volume," and then "determining [] one or more uptake metrics." Ex. B at 74:7-36; *see also id.* at 78:44-79:5 (claim 39); 79:18-45 (claim 40); 79:59-80:19 (claim 41); 80:38-65 (claim 42); 84:31-58 (claim 48); 85:8-35 (claim 49); 85:57-86:17 (claim 50). See, for example, how the body of representative claim 1 restates every

core element of the preamble, where each color-coded element matches across the preamble and the body of the claim:

1. A method for automatically processing 3D images to identify 3D volumes within the 3D images that correspond to a prostate of a subject and determining one or more uptake metrics indicative of radiopharmaceutical uptake therein, the method comprising:

(a) receiving, by a processor of a computing device, a 3D anatomical image of the subject obtained using an anatomical imaging modality, wherein the 3D anatomical image comprises a graphical representation of tissue within a subject, at least a portion of which corresponds to a pelvic region of the subject;

(b) receiving, by the processor, a 3D functional image of the subject obtained using a functional imaging modality, wherein the 3D functional image comprises a plurality of voxels, each representing a particular physical volume within the subject and having an intensity value that represents detected radiation emitted from the particular physical volume, wherein at least a portion of the plurality of voxels of the 3D functional image represent physical volumes within the pelvic region of the subject;

(c) determining, by the processor, using a first module, an initial volume of interest (VOI) within the 3D anatomical image, the initial VOI corresponding to tissue within the pelvic region of the subject and excluding tissue outside the pelvic region of the subject;

(d) identifying, by the processor, using a second module, a prostate volume within the initial VOI corresponding to the prostate of the subject; and

(e) determining, by the processor, the one or more uptake metrics using the 3D functional image and the prostate volume identified within the initial VOI of the 3D anatomical image, and

wherein the method comprises:

identifying, by the processor, a reference volume within the 3D anatomical image, the reference volume corresponding to a reference tissue region within the subject; and

at step (e), determining at least one of the one or more uptake metrics using the 3D functional image and the reference volume identified within the 3D anatomical image.

The preamble itself is thus unnecessary to give life to the claims. *See Catalina Mktg. Int'l*, 289 F.3d at 808. Therefore, the preambles are "not a limitation because [they] only describe[] the intended use of the invention; [while] the structure is fully described in the remainder of the claim."

- 14 -

*K&K Jump Start/Chargers v. Schumacher Elec. Corp.*, 52 F. App'x. 135, 141 (Fed. Cir. 2002). The Court should thus decline to construe the proposed term because it only appears in non-limiting preambles. *See Abiomed, Inc. v. Maquet Cardiovascular LLC*, 329 F. Supp. 3d 1, 49-50 (D. Mass. 2018) (declining to construe terms in preamble because they were not limiting).

### D.    "first module" and "second module"

| Term | Defendant's Construction | Plaintiffs' Construction |
|---|---|---|
| "first module" | This term should be construed as a means-plus-function term under 35 U.S.C. § 112(f).<br><br>Function: determine an initial volume of interest (VOI) within the 3D anatomical image, the initial VOI corresponding to tissue within the pelvic region of the subject and excluding tissue outside the pelvic region of the subject<br><br>Corresponding structure: a first convolutional neural network as depicted in Figs. 7A-E | This term should not be construed as a means-plus-function term under 35 U.S.C. § 112(f). |
| "second module" | This term should be construed as a means-plus-function term under 35 U.S.C. § 112(f).<br><br>Function: identify within the initial VOI a prostate volume corresponding to the prostate of a subject<br><br>Corresponding structure: a second convolutional neural network as depicted in Figs. 7F-J | This term should not be construed as a means-plus-function term under 35 U.S.C. § 112(f). |

Defendant cannot carry its burden to prove that the terms the terms "first module" and "second module" in claims 1, 39-42, and 48-50 of the '486 Patent are means-plus-function terms under Section 112(f).

Since it is undisputed that the '486 Patent does not expressly claim a "means," Defendant must overcome the presumption that Section 112(f) does not apply. *See Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022) ("[W]e presume that a claim limitation is not drafted in means-plus-function format in the absence of the term 'means.'"). "To overcome this

- 15 -

presumption," Defendant must "show, by a preponderance of the evidence, that [POSAs] would not have understood [the disputed term(s)] to connote structure in light of the claims as a whole." *Id.* at 1367.

Importantly, "structure can be recited in various ways, including through the use of 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC*, 28 F.4th at 1366 (citation omitted). As the Federal Circuit has explained, "the specific structure of software code and applications is partly defined by its function." *Id.* at 1368. Accordingly, "[i]n determining whether software limitations like those at issue here recite sufficient structure" to avoid a means-plus-function designation, "we can look beyond the initial 'code' or 'application' term to the functional language to see if a person of ordinary skill would have understood the claim limitation as a whole to connote sufficiently definite structure." *Id.* (citation omitted).

Here, Defendant cannot prove that "first module" and "second module" do not "connote structure in light of the claims as a whole." *See id*. Claims 1, 39-42, and 48-50 of the '486 Patent describe systems and methods for automatically analyzing 3D medical images to quantify radiopharmaceutical uptake in the prostate. Claim 1 is representative. It recites a procedure implemented "by a processor of a computing device" that executes software components configured to localize, segment, and analyze 3D images in order to identify the prostate and determine radiopharmaceutical uptake metrics:

- At steps (a) and (b), the claim discloses receiving a 3D anatomical image and a 3D functional image from the subject.

- At step (c), the claim discloses "determining, by the processor, using a **first module**, an initial volume of interest within the 3D anatomical image, the initial VOI corresponding to tissue within the pelvic region of the subject and excluding tissue outside the pelvic region

of the subject." The first module is thus specifically responsible for limiting the computational and anatomical scope of the later steps by identifying an initial VOI corresponding to only the pelvic region.

- At step (d), the claim then discloses "identifying, by the processor, using a **second module**, a prostate volume within the initial VOI corresponding to the prostate of the subject . . ." The second module thus refines the analysis by identifying the specific prostate volume within the initial VOI determined by the first module.

- At step (e), the claim then teaches "determining, by the processor, the one or more uptake metrics using the 3D functional image and the prostate volume identified" by using the first and second modules.

In light of the claim as a whole, it is clear that both the "first" and "second module" are separate software structures[5] executed "by the processor" that perform distinct tasks as part of the overall system/method. Those tasks require highly technical and structured implementation involving region-based filtering, anatomical landmarking, and image-based classification. The claims thus connote more than sufficient structure for both the "first module" and the "second module." *See Dyfan, LLC*, 28 F.4th at 1366.

Although unnecessary given the clarity of the claims, the specification provides further structural detail about some of the different ways the "first module" and "second module" can perform their distinct tasks. *Compare* Ex. B at 12:51-58 (certain embodiments where the modules are fully separate convolutional neural networks ("CNN")) *and* FIG. 34 (same), *with id.* at 7:14-8:44 (certain embodiments where only first module is a CNN) *and* FIG. 1 (embodiment where only second module is a CNN). The specification explains the structure and implementation of these embodiments in technical detail. For example, the specification provides a detailed

---

[5] In the context of computer programming, a "module" means "a part of a computer or software system or program that has a function and works together with other related parts." *See, e.g., Module*, Cambridge Bus. English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/module (last visited July 10, 2025); *see also Module*, Oxford English Dictionary, https://doi.org/10.1093/OED/8128892151 (last visited July 10, 2025) ("Any of a number of distinct units from which a computer program may be built up, or into which a complex process or activity is analysed (usually for computer simulation), each of which is complete in itself but bears a definite relationship to the other units.").

architecture describing how a first module may be implemented, e.g., as a CNN, to identify a pelvic region volume. *Id*. at 29:38-46; FIG. 7A-E. The specification also provides a detailed architecture describing how a second module may be implemented, e.g., as a CNN, to segment a prostate volume. *Id.* at 29:47-30:2; FIG. 7F-J. The specification also dedicates multiple pages to describing an example architecture in which the two modules are integrated with other computational modules to execute a multi-step process involving localization, bounding boxes, endpoint cropping, the use of a SingleSeg Machine, segmentation masking, and other steps:



FIG. 12

*Id*. at FIG. 12. Other subsections describe various alternative detailed implementations. *Id*. at subsection beginning at 34:1; subsection beginning at 35:37; *see also* FIGs. 13-14.

A POSA could thus "reasonably discern" from the intrinsic record that the terms "first module" and "second module" are "used not as generic or black box recitations of structure or abstractions," but are instead adequately defined steps of the claims. *See Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018).

Defendant may overgeneralize the holding of two Federal Circuit decisions to argue that the term "module" is inherently a means-plus-function term. *See Williamson v. Citrix Online, LLC*,

792 F.3d 1339, 1350-51 (Fed. Cir. 2015); *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021). But the facts of those two cases contrast with the facts presented here. The Federal Circuit has never held that "module" is *per se* non-structural. Instead, *Williamson* and *Rain* held that "module" is non-structural only where: (a) the claim vaguely described the module's task (e.g., "distributed learning control module") with no further structural context across the entire claim, and (b) the specification did not explain in detail how the module's task could be performed at a technical level. *See Williamson*, 792 F.3d at 1350-51; *Rain*, 989 F.3d at 1006. In fact, in *Rain*, the specification "d[id] not even mention" the module term at all. *Rain*, 989 F.3d at 1006. The more apposite cases, like *Zeroclick*, *supra*, find that terms like "first module" and "second module" are not means-plus-function terms. *See, e.g.*, *Zeroclick*, 891 F.3d at 1008. Therefore, the terms "first module" and "second module" should not be construed as means-plus-function terms.

   E. **"a dilated bladder volume"**

| Defendant's Construction | Plaintiffs' Construction |
|---|---|
| a volume that is a predefined amount larger than, but the same shape as, the identified bladder volume | Plain and ordinary meaning<br><br>Alternatively, "a volume created by expanding the identified bladder volume" |

   Claims 9, 41, and 49 of the '486 Patent refer to "a dilated bladder volume." Representative Claim 9, for example, recites "the method of claim 1, comprising: identifying, by the processor, a bladder volume within the 3D anatomical image corresponding to a bladder of the subject; determining, by the processor, **a dilated bladder volume** by applying a morphological dilation operation to the identified bladder volume; and, at step (e), determining the one or more uptake metrics using intensity values of voxels of the 3D functional image that (i) correspond to the prostate volume identified within the VOI of the 3D anatomical image, but (ii) do not correspond

to regions of the 3D anatomical image within the **dilated bladder volume**." (emphasis added). The parties dispute (1) whether the term "a dilated bladder volume" should be given its plain and ordinary meaning, which is "a volume created by expanding the identified bladder volume" (Plaintiffs' position), or (2) whether the term should be narrowed and rewritten to "a volume that is **a predefined amount larger than, but the same shape as**, the identified bladder volume" (to serve Defendant's litigation positions).

As the patentee neither clearly defined nor disavowed the full scope of the disputed claim term in the specification or prosecution, the plain and ordinary meaning applies. *See Sumitomo*, 887 F.3d at 1157. In light of the claims and specification, the plain and ordinary meaning of "dilated bladder volume" is simply to take "the identified bladder volume" from the prior step and expand it (i.e., dilate it).

The specification supports this common-sense interpretation. The specification contains a subsection titled "Bladder Dilation" (beginning at Ex. B at 39:64), which does not encumber the term "dilated bladder volume" with specific requirements about how it must be "a predefined amount larger than, but the same shape as" the bladder volume. It simply explains that a bladder is dilated (i.e., made larger) via morphological dilation. Ex. B at 39:66-67. The plain and ordinary meaning should thus control here (or Plaintiffs' alternative that closely matches the plain and ordinary meaning).

In contrast, Defendant seeks to import at least two limitations that are unsupported by the intrinsic record: "a volume that is **<u>a predefined amount larger than</u>**, **<u>but the same shape as</u>**, the identified bladder volume." The claims, specification, and prosecution history do not support adding these limitations. Defendant cannot, therefore, use claim construction to import these unsupported limitations into the claims. *See Nellcor*, 402 F.3d at 1371.

Not only are the additional limitations unsupported by the intrinsic record, but they also inject ambiguity into the claim's scope. For example, the Defendant's construction does not explain how the "predefined amount" is to be determined, or how close to the "same shape" the dilated bladder must be. *See In re Body Sci. LLC Patent Litig.*, 2014 U.S. Dist. LEXIS 148160, at *29 (adopting plain and ordinary meaning of term where "Defendants' proposed construction would only render the claim redundant, and more likely create confusion than clarity"). The Court should thus construe the term "a dilated bladder volume" per its plain and ordinary meaning.

### F.    "correct[ing] for cross-talk from the bladder"

| Defendant's Construction | Plaintiffs' Construction |
|---|---|
| adjust[ing] the measured intensities of one or more voxels of the 3D functional image that correspond to the prostate volume | Plain and ordinary meaning<br><br>Alternatively, "identify[ing] intensities within the 3D functional image that correspond to the identified bladder volume and adjusting at least a portion of those intensities" |

Claims 7, 40, and 48 of the '486 Patent refer to "correct[ing] for cross-talk from the bladder." Although the parties' proposed constructions slightly differ in a few other respects, the crux of the dispute is whether the correcting involves adjusting intensities corresponding to the *prostate* volume or the *bladder* volume. The relevant claims are, however, clear: the *bladder* volume intensities are adjusted. Defendant asks the Court to ignore the clear claim language, eschew the doctrine of claim differentiation, and improperly import a limitation from the specification. The Court should instead apply the plain and ordinary meaning, or Plaintiffs' alternative construction.

Representative Claim 7, for example, teaches:

The method of claim 1, the method comprising:

identifying, by the processor, **a bladder volume within the 3D anatomical image** corresponding to a bladder of the subject; and [then]

at step (e), correcting for cross-talk from the bladder using intensities of voxels of the 3D functional image **corresponding to *the* identified bladder volume within the 3D anatomical image.**

(emphases added). Claims 40 and 48 are the same. The claim language is thus straightforward: "correct[ing] for cross-talk from the bladder" is adjusting intensities that "correspond[] to *the* identified *bladder* volume," not "the *prostate* volume." *See Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 130 F.4th 1372, 1381 (Fed. Cir. 2025) ("The claims themselves provide substantial guidance as to the meaning of particular claim terms."); *Phillips*, 415 F.3d at 1314 ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.") (citation omitted). The analysis can end here.

The specification provides additional support for Plaintiffs' position. The specification repeatedly discusses how to adjust voxel intensities corresponding to the *bladder* in order to avoid confusion about which part of the medical image represents the bladder or a different organ, like the prostate. *See, e.g.*, Ex. B ('486 Patent) at 40:31-38 ("bladder suppression is computed from and applied to a portion of the 3D functional image that lies within a bladder suppression bounding box of a specific size about the identified bladder volume."); *id.* at 40:7-14 (similar). The specification never requires that the cross-talk adjustments only target a prostate volume.

Defendant's proposed construction is thus inappropriate for at least three reasons:

First, it contradicts the plain claim language, as discussed above. *Supra* at 21-22.

Second, it violates the doctrine of claim differentiation. Defendant's construction aligns more closely with dependent claim 8, which claims "the method of claim 7, wherein correcting for cross-talk from the bladder" includes adjusting voxels "corresponding to the identified *prostate* volume." (emphasis added). Defendant's construction would collapse the difference between claim 8 and claim 7. *See Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a

useful guide in understanding the meaning of particular claim terms . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.") (internal citation omitted).

Third, Defendant's construction improperly limits the claim in a way that the intrinsic record does not require. The specification discusses multiple examples of adjusting for cross-talk corresponding to the bladder volume. The specification never requires that the cross-talk adjustments must only occur within the prostate volume.

The Court should thus give the term its plain and ordinary meaning (or Plaintiffs' alternative construction that closely matches that meaning).

## IV.    CONCLUSION

For the reasons set forth above, the Court should find in favor of Plaintiffs as to all the disputed claim terms.

Respectfully submitted,

PROGENICS PHARMACEUTICALS,
INC. AND EXINI DIAGNOSTICS AB

By its attorneys,

/s/ Michael H. Bunis
Michael H. Bunis (BBO #566839)
Anita M. C. Spieth (BBO #676302)
John C. Calhoun (BBO #694479)
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000
mbunis@choate.com
aspieth@choate.com
jcalhoun@choate.com

Dated: July 11, 2025

- 23 -

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system on July 11, 2025, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Michael H. Bunis
Michael H. Bunis (BBO #566839)